UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| SUSAN LACAVA and CALVIN KENDRICK, on Behalf of themselves and all Others Similarly Situated, | ) ) ) ) | No. |
| | ) ) | CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE |
| Plaintiffs, | ) ) | RELIEF |
| vs. | ) ) | |
| DENSO CORPORATION and DENSO INTERNATIONAL AMERICA INC. | ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) ) | |

Plaintiffs Susan Lacava and Calvin Kendrick  ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

## <u>NATURE OF ACTION</u>

1.     This lawsuit is brought as a proposed class action against DENSO Defendants, defined below, for engaging in a nearly decade long conspiracy to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Heating Control Panels ("HCPs").  The DENSO Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2.      DENSO Corporation ("DENSO") recently agreed to plead guilty and pay a criminal fine of $78 million –stemming from its participation in two separate unlawful conspiracies to fix prices and rig bids for certain auto parts, including HCPs.  The ongoing criminal investigation launched by the United States Department of Justice's Antitrust Division ("DOJ") into the auto parts industry has already resulted in more than $748 million in criminal fines.

3.      Plaintiffs seek to represent consumers who purchased or leased new motor vehicles containing HCPs or replacement HCPs for their motor vehicles during the period from and including January 2000 up to and including February 2010 (the "Class Period").

4.      HCPs are located in the center console of an automobile and control the temperature of the interior environment of a vehicle.

5.      The DENSO Defendants (all as defined below, and together, the " DENSO Defendants") manufacture, market, and sell HCPs throughout the United States.

6.      The DENSO Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for HCPs.

7.      Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy involving automotive parts since at least February 2010.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the markets for a number of different automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the industry.  The European Commission

Competition Authority ("EC") has also conducted dawn raids at the European offices of several of these competitors.

8.      Defendant DENSO has pleaded guilty to participating in a conspiracy to fix prices and rig bids of HCPs from at least as early as January 2000 and continuing until at least February 2010, and has agreed to pay a $78 million criminal fine related to its unlawful participation in two separate price-fixing and bid rigging conspiracies, including HCPs.  The DENSO Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for HCPs.  The combination and conspiracy engaged in by the DENSO Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.      As part of its plea agreement, DENSO has agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

10.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for HCPs during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against the DENSO Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against the DENSO Defendants for violation

of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from at least one of the DENSO Defendants.

13.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the DENSO Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

14.     This Court has *in personam* jurisdiction over each of the DENSO Defendants because each DENSO Defendant, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of HCPs throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing

business throughout the United States, including in this district. The DENSO Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States.

15. The DENSO Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

16. The activities of the DENSO Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The DENSO Defendants' products are sold in the flow of interstate commerce.

17. HCPs manufactured abroad by the DENSO Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any HCPs are purchased in the United States, and such HCPs do not constitute import commerce, the DENSO Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

18. The DENSO Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. The DENSO Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for HCPs, which conspiracy unreasonably restrained trade and adversely affected the market for HCPs.

19.     The DENSO Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased HCPs for personal use, including Plaintiffs and the Classes.

## PARTIES

20.     Plaintiff Susan Lacava is a resident of Wisconsin who purchased HCPs indirectly from the DENSO Defendants and/or their co-conspirators.

21.     Plaintiff Calvin Kendrick is a resident of Alabama who purchased HCPs indirectly from the DENSO Defendants and/or their co-conspirators.

**The DENSO Defendants**

22.     Defendant DENSO Corp. is a Japanese corporation.  Defendant DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.

23.     Defendant DENSO International America, Inc. is an Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  Defendant DENSO International America, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.

24.     DENSO Corp. and DENSO International America, Inc. are herein referred to and shall be referred to together herein as the "DENSO Defendants" or "DENSO."

## AGENTS AND CO-CONSPIRATORS

25.     Each DENSO Defendant acted as the principal of or agent for the other DENSO Defendant with respect to the acts, violations, and common course of conduct alleged.

26.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the DENSO Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

27.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.     The HCP Industry

28.     HCPs are located in the center console of an automobile and control the temperature of the interior environment of a vehicle.

29.     When purchasing HCPs, the automobile manufacturer issues Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model-specific parts.  Automotive parts suppliers submit quotations, or bids, to automobile manufacturers in response to RFQs, and the automobile manufacturer usually awards the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  Japanese automobile manufacturers procure parts for U.S.-manufactured vehicles both in Japan and the United States.

30.     The DENSO Defendants and their co-conspirators supplied HCPs to automobile manufacturers for installation in vehicles manufactured and sold in the United States and

elsewhere.  The DENSO Defendants and their co-conspirators manufactured HCPs (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

31.     Plaintiffs and members of the proposed Classes purchased HCPs indirectly from the DENSO Defendants and/or their co-conspirators.  By way of example, an owner of a vehicle may indirectly purchase an HCP from the DENSO Defendants or their co-conspirators as part of purchasing or leasing the new vehicle.   An owner of a vehicle may also indirectly purchase a replacement HCP from DENSO Defendants when repairing a damaged vehicle or where the HCP is defective.

**B.      Characteristics of the HCP Market Render the Conspiracy More Plausible**

32.     Characteristics of the HCP market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, there are barriers to entry for HCPs

33.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

34.     There are substantial barriers that preclude, reduce, or make more difficult entry into the HCP market.  For instance, DENSO owns several patents for the component parts that make up HCPs.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

8

C.     **The DENSO Defendants and Their Co-Conspirators Increased Prices for HCPs Despite Steady Costs**

35.     In a competitive market, falling material and labor costs would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower costs to lower their prices in order to capture market share.  The only economically rational action in such a situation is for each competitor to lower its own prices.

36.     In a market where ostensible competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

37.     The price of HCPs increased during the Class Period, while major input costs virtually remained the same.  In a competitive market, steady input costs should not have resulted in rising prices to DENSO Defendants' and their co-conspirators' customers for HCPs.  Such anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

D.     **Government Investigation**

38.     A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts, including HCPs.

39.     The probe originated in Europe as the result of several European automobile manufacturers coming together to bring a complaint to the EC.  One carmaker is said to have failed to attract competitive bids for automotive wire harness systems, leading the company to join with other carmakers to take their complaint to the EC.

40.     On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers as part of an investigation into anti-competitive conduct related

to the manufacturing and sale of automotive parts.  The EC also carried out additional raids at the European offices of several suppliers of automotive parts on June 7, 2010.  Specifically, EC investigators raided the offices of Leoni AG, S-Y Systems Technologies Europe GmbH, Yazaki Corporation and DENSO.  "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

41.     In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of DENSO as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.

42.     The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.  "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

43.     Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including DENSO's subsidiary in Southfield, Michigan.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

44.     To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a

seemingly lawful business would uncover evidence of antitrust violations and that claimed

evidence must have been examined and accepted by a magistrate.  That belief, which was

recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy

information.

**E.**     **Guilty Pleas Stemming from the DOJ's Investigation of the Automotive Parts Industry**

45.     On January 30, 2012, the DOJ announced that DENSO had agreed to pay a $78

million fine and plead guilty to a two count criminal information charging DENSO with:  (1)

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate

competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and

maintain the prices of, Electronic Control Units ("ECUs")[1] sold to certain automobile

manufacturers in the United States and elsewhere from at least as early as January 2000 and

continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (2)

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate

competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and

maintain the prices of HCPs sold to certain automobile manufacturers in the United States and

elsewhere from at least as early as January 2000 and continuing until at least February 2010 in

violation of the Sherman Act, 15 U.S.C. § 1.

46.     According to the criminal information filed against DENSO, DENSO and its co-

conspirators carried out the conspiracy by:

(a)     participating in meetings, conversations, and communications in the

United States and Japan to discuss the bids and price quotations to be submitted to certain

automobile manufacturers in the United States and elsewhere;

(b)      agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(c)      agreeing, during those meetings, conversations, and communications, to allocate the supply of HCPs sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in the United States and elsewhere;

(e)      submitting bids, price quotations, and price adjustments to certain automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)      selling HCPs to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for HCPs sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)      employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

---

[1] The criminal information defines an Electronic Control Unit as an embedded system that controls one or more of the electronic systems or subsystems in a motor vehicle.

47.     The plea agreement is an outgrowth of the initial charges in the DOJ's international cartel investigation of price-fixing and bid rigging in the automotive parts industry.

48.     On January 30, 2012, the DOJ announced that Yazaki Corporation ("Yazaki") had agreed to pay a $470 million fine and plead guilty to a three-count criminal information charging Yazaki with:  (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere from at least as early as December 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (3)  participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of fuel senders sold to certain automobile manufacturers in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

49.     In addition to Yazaki, four executives from Yazaki (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada – pleaded guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive

wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. These four Yazaki executives will serve prison time ranging from 15 months to two years. The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

50.     On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. ("Furukawa") had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harness systems to automobile manufacturers.

51.     Three of Furukawa's executives also pleaded guilty to the same conspiracy. The court sentenced two of the executives to 15 and 18 month prison sentences, to be served in the United States. Sentencing of the third executive, who agreed to serve a year and a day in prison in the United States, is scheduled for February 28, 2012.

52.     "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division. "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

53.     "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

## CLASS ACTION ALLEGATIONS

54.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that indirectly purchased, during the Class Period, HCPs, for personal use and not for resale, including as a stand-alone replacement product or as a component of a new or leased motor vehicle from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

55.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the state antitrust, unfair competition, and consumer protection laws on behalf of the following class (the "Damages Class"):

> All persons and entities that indirectly purchased, during the Class Period, HCPs, for personal use and not for resale, including as a stand-alone replacement product or as a component of a new or leased motor vehicle from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

56.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased HCPs directly or for resale.

57.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

58.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to

all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether the DENSO Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of HCPs sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, as alleged in the Second Claim for Relief;

(f)     Whether DENSO Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

(g)     Whether the conduct of the DENSO Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of HCPs sold in the United States during the Class Period;

(i)     Whether the DENSO Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

59.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for HCPs purchased indirectly from the DENSO Defendants or their co-conspirators.

60.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

61.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

62.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

63.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

64.     The DENSO Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to HCPs;

(b)     The prices of HCPs have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

(c)     Indirect purchasers of HCPs have been deprived of free and open competition.

65.     During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for HCPs.

66.     The market for HCPs and the market for cars are inextricably linked and intertwined because the market for HCPs exists to serve the vehicle market.  Without the vehicles, the HCPs have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for HCPs.  As was stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

67.     HCPs are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, HCPs follow a traceable physical chain of distribution from the DENSO Defendants to Plaintiffs and the members of the Classes, and

any costs attributable to HCPs can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

68.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for HCPs than they would have paid in the absence of DENSO Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## **FRAUDULENT CONCEALMENT**

69.     Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until January 30, 2012, the date that the DOJ publicly announced DENSO's guilty plea.

70.     Because the DENSO Defendants' agreements, understandings and conspiracies were kept secret until January 30, 2012, Plaintiffs and members of the Classes before that time were unaware of the DENSO Defendants' unlawful conduct, and they did not know before then that they were paying supra-competitive prices for HCPs throughout the United States during the Class Period.

71.     The affirmative acts of the HCP Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

72.     By its very nature, the HCP Defendants' anti-competitive conspiracy was inherently self-concealing.  HCPs are not exempt from antitrust regulation, and thus, before January 30, 2012, Plaintiffs reasonably considered it to be a competitive industry.  Accordingly,

a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of the DENSO Defendants' HCP prices before January 30, 2012.

73.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the DENSO Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

74.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 30, 2012, when the DOJ issued a press release concerning DENSO's anticompetitive conduct in the market for HCPs.

75.     As a result of the DENSO Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

76.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

77.     The DENSO Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

78.     The acts done by each of the DENSO Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers,

agents, employees, or representatives while actively engaged in the management of the DENSO Defendants' affairs.

79.     At least as early as January 2000, and continuing until at least February 2010, the exact dates being unknown to Plaintiffs, the DENSO Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize and control prices and rig bids for HCPs, thereby creating anticompetitive effects.

80.     The anti-competitive acts were intentionally directed at the United States market for HCPs and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for HCPs throughout the United States.

81.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for HCPs.

82.     As a result of the DENSO Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased HCPs have been harmed by being forced to pay inflated, supra-competitive prices for HCPs.

83.     In formulating and carrying out the alleged agreement, understanding and conspiracy, the DENSO Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

84.     The DENSO Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for HCPs has been restrained, suppressed and/or eliminated in the United States;

(b)     Prices for HCPs sold by the DENSO Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased HCPs indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

85.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for HCPs purchased indirectly from the DENSO Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

86.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

87.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against the DENSO Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

88.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

89.     From as early as January 2000 and continuing until at least February 2010, the DENSO Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of HCPs in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

90.     The contract, combination, or conspiracy consisted of an agreement among the DENSO Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at

artificially supra-competitive levels prices for HCPs, rig bids and to allocate customers for HCPs sold in the United States.

91.     In formulating and effectuating this conspiracy, the DENSO Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)     participating in meetings and conversations among themselves during which they agreed to price HCPs at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to HCPs sold in the United States;

(b)     allocating customers and markets for HCPs in the United States in furtherance of their agreements; and

(c)     participating in meetings and conversations among themselves to implement, adhere to and police the unlawful agreements they reached.

92.     The DENSO Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to HCPs.

93.     The DENSO Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

94.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

95.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

96.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq*.

97.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

98.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

99.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

100.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

101.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

102.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq*.

103.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

104.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

105.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

106.     The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*.

107.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

108.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

109.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

110.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

111.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

112.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

113.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

114.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

115.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

116.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

117.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

118.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

119.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

120.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

121.    The DENSO Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq.*

122.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of the DENSO Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for HCPs than they otherwise would have paid in the absence of the DENSO Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes the DENSO Defendants' conduct unlawful.

123.    In addition, the DENSO Defendants have profited significantly from the aforesaid conspiracy.  The DENSO Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

124.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

125.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

126.    As a result of their unlawful conduct described above, the DENSO Defendants have and will continue to be unjustly enriched.  The DENSO Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of HCPs.

127.    The DENSO Defendants have benefited from their unlawful acts and it would be inequitable for the DENSO Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Damages Class for HCPs.

128.    Plaintiffs and the members of the Damages Class are entitled to the amount of the DENSO Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against the DENSO Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     The DENSO Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits the DENSO Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.


DATED:  January 31, 2012

                                        THE MILLER LAW FIRM

                                        By */s/ E. Powell Miller*_____
                                           E. Powell Miller
                                           950 West University Drive
                                           Rochester, Michigan  48307
                                           Tel: (248) 841-2200
                                           Fax: (248) 652-2852
                                           epm@millerlawpc.com

                                           Hollis Salzman
                                           Bernard Persky
                                           Kellie Lerner
                                           Seth Gassman
                                           LABATON SUCHAROW LLP
                                           140 Broadway
                                           New York, NY 10005
                                           (212) 907-0700
                                           hsalzman@labaton.com
                                           bpersky@labaton.com
                                           klerner@labaton.com
                                           sgassman@labaton.com

M. Stephen Dampier
Law Offices of M. Stephen
  Dampier, P.C.
55 N. Section Street
Fairhope, AL  36532
Tel: (251) 929.0900
Fax: (251) 929.0800
stevedampier@dampierlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

## **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED:  January 31, 2012

THE MILLER LAW FIRM

By */s/ E. Powell Miller*
   E. Powell Miller
   950 West University Drive
   Rochester, Michigan  48307
   Tel: (248) 841-2200
   Fax: (248) 652-2852
   epm@millerlawpc.com

*Attorneys for Plaintiffs and the Proposed*
*Classes*